OVERTON, J.
 

 At a sale at public auction, made on June 12, 1924, certain improved real property, belonging to the succession of Elizabeth Curry, was adjudicated at public auction to the defendant herein for $12,300. According to the terms of the sale, the purchaser was to pay the cost of advertising the salé of the property, amounting in this instance to $58.80, and to make a deposit of 10 per cent, on the amount due at the moment of the adjudication. Defendant failed or refused to comply with her bid, whereupon the property was advertised for sale a la folie enchSre, after advertising three times during a period of ten days, and sold thereat on July 10, 1924, to Mrs. A. F. Storm for $9,250.
 

 After the adjudication to Mrs. Storm, plaintiff, in her capacity as administratrix of the succession of Mrs. Curry, instituted the present suit to recover of defendant the sum of $3,298.80, with legal interest thereon from judicial demand; this sum representing the difference between the price for which the property was actually sold and the amount
 
 *109
 
 of defendant’s bid, plus tbe cost of advertising for the first sale; amounting to $58.80, the cost of a plan of the property, amounting to $10, and rent for the property at a rental of $40 a month, amounting to $1S0.
 

 This case was before this court in 1925, on an appeal from a judgment sustaining, among' other exceptions, one of no cause of action. After hearing the appeal, this'court reached the conclusion that the petition did show a cause of action, that the remaining exceptions were without merit, and accordingly reversed the judgment of the lower court, and remanded the case, the Chief Justice dissenting from the conclusion reached on the exception of no cause of action. Stoekelback v. Bradley, 159 La. 336, 105 So. 363.
 

 When the case reached the trial court it was tried on its merits, and judgment rendered in favor of plaintiff for $3,298.80, with legal interest thereon from judicial demand, the amount sued for.
 

 The evidence discloses that defendant, before the death of Mrs. Curry, the owner of the property, at the latter’s request, lived with Mrs. Curry for a short period prior to her death. After the death of Mrs. Curry, defendant concluded to attend the auction of the property of Mrs. Curry, out of which this litigation grows, with the end in view of purchasing the property. C. H. Háight, an appraiser, and superintendent of a homestead association, examined the property and advised defendant that it was worth $8,000. Gilbert Potter, a real estate broker, also examined the property and appraised it at $8,-000, but advised defendant that, if she was very desirous of acquiring the property and desired it for her own use, she might bid as much as $8,500, but not to bid more. Defendant requested both Haight and Potter to bid for her, but told neither that she had requested the other to do so, and both remained in ignorance of her request to the' other. Haight, Potter, and defendant, were present at the auction; Haight and Potter standing near defendant. The bidding commenced at $7,000. Potter quit after making a bid of $8,500. Haight, thinking that defendant desired him to do so, continued to bid, and made the last bid of $12,300, for which the property was adjudicated. When the adjudication was made, the auctioneer or his clerk requested the successful bidder to come to the auctioneer’s stand. Haight pointed out to defendant the auctioneer’s clerk and left. Defendant went to the stand, and the clerk presented a card to her, which she signed, showing the name of the firm of auctioneers from whom the property was purchased, the street upon which the property is situated, the number of the property, the amount of the bid, and certain costs to be paid by the purchaser. Defendant later failed or refused to comply with the bid, and the property was then sold a la folie enchére, as stated in the first part of this opinion.
 

 During the trial, plaintiff offered parol evidence to show that the bids Haight was making were for defendant, and that he was bidding for her at her request, previously made. This evidence was objected to for the reason that parol evidence is not admissible for the purpose of establishing an agency to purchase real estate. While parol evidence is not admissible to show such an agency, yet defendant was standing by Haight’s side, when the bids were made, and when the property was adjudicated she went forward, as the successful bidder, and signed the. card showing that she had purchased the property. The parol evidence received was admissible at least to show why she signed the card. The signing of it served, in effect, as a written acknowledgment that Haight was authorized to bid for her.
 

 The objection was also made by defendant that evidence is inadmissible to establish ratification on the part of the prin
 
 *111
 
 cipal where the petition does not contain an allegation showing ratification. This objection is urged against the admission of the card showing, defendant’s purchase, and defendant cites, in support of her position, Noble v. Plouf, 154 La. 430, 97 So. 599. It suffices to point out,- however, that in this instance the card was not offered to show ratification of any unauthorized act by Haight or any one else, but for the evident purpose of showing that defendant acknowledged in writing that she purchased the property at auction for $12,300, certain costs to be paid by her. The card does not even purport to be an instrument ratifying any unauthorized act. It was clearly admissible.
 

 Defendant also urges that she ought not to be held liable, because the auctioneer or his clerk represented to her that the affixing of her signature to the card, which she contends was a blank card, would not amount to anything, and that the card should not have been received in evidence, because at least the purchase price had been left blank, and had to be supplied by parol evidence. In our view the evidence does not establish that the card was blank, or that the amount of the purchase price had not been written on it, when defendant signed it. To the contrary, the evidence establishes that the card, with the exception of the amount of th'e bid, was filled out before the auction began, and that the amount of the bid was inserted before the card was signed. We are also of the opinion that the auctioneer or his clerk did not make the representation attributed to him concerning the effect of signing the card.
 

 Defendant also urges that she should not be held liable because she requested Haight to discontinue bidding for her account, and made every effort to have him do so, and, moreover, because she had limited him to $8,000. The evidence shows thatHaight had advised defendant that the property was worth $8,000, that the homestead association would lend her about $6,000 on it, and that, after the bidding reached $9,-500, he bid as defendant “pulled his sleeve to bid.” Defendant testified that she understood Haight was deaf, and pulled his sleeve to indicate that he should not bid more for her account. As to what was meant by the pulling of the sleeve, much depends upon .when it was pulled. If it were pulled at the time Haight bid, it might well mean that he should not bid more. If, on the other hand, it were pulled after some one else bid, it might well mean for him to bid more. Defendant had ample opportunity to stop Haight if he was misunderstanding her signals, since, as appears from the notation of the amounts of bids on the auctioneer’s card, noted by his clerk as the bids were made, in the neighborhood of thirty were made after the bidding reached $9,500. But whatever doubt there may be regarding the matter it must be resolved against defendant, since .she signed the auctioneer’s card■ acknowledging the purchase.
 

 Defendant further urges that she should not be held liable because she was not put in default, in that there was not tendered her a clear and unincumbered title, free from suggestion of litigation, together with mortgage and conveyance certificates and the necessary tax researches. The record shows that defendant not only notified the attorneys for the plaintiff herein that she could not comply with her bid, but her position, almost from the moment after the adjudication and the signing of the card, was that there was no valid adjudication of the property, and no obligation upon her part to comply with her bid. Thus, as appears from her evidence:
 

 “Q. Tour position was, gentlemen, I haven’t bought the property? A. Tes, sir.
 

 “Q. I refuse to make any deposit or carry this out? A. Tes, sir; positive.”
 

 
 *113
 
 The iaw does not contemplate the doing of a vain thing. When one denies the existence of an obligation or contract a putting in mora is unnecessary. Beck v. Fleitas, .37 La. Ann. 495; Reinach v. Jung, 122 La. 610, 48 So. 124; Stockelback v. Bradley, 159 La. 336, 105 So. 363. As to whether the title to the property was valid and unincumbered is a thing aside from putting in default, and, if there were any defects in the title or incumbrances on the property, defendant should have set them up and established them.
 

 Defendant also urges that she should not be held liable, because more than two persons were bidding for her account, through error, and that the purchase price was thereby enhanced beyond the real value of the property. The evidence discloses, as we have said, that defendant requested both Haight and Potter to bid for her, and that neither knew for whom the other was bidding. While this is a strange error, brought about solely by defendant’s own carelessness, in her apparent anxiety to make sure that she would have some one to represent her at the auction, still we think that the evidence shows that the error did not have the effect attributed to it by defendant. Potter ceased bidding after he had bid $8,500. While there is some evidence to the effect that he bid after reaching that amount, still we think that this evidence is erroneous. Potter was a real estate broker, and was likely to remain cool and know what he was doing at an auction. He testified positively that he ceased bidding after making the bid of $8,500. Moreover, that amount was the largest that Potter advised defendant to pay. We think that his evidence in this respect clearly preponderates over that to the contrary, which apparentlly is based upon impressions obtained while laboring under excitement. After Potter ceased bidding, Haight was alone bidding for defendant. Others continued bidding against Haight. The record does not disclose the names of all who bid, but it shows that Bradley, the brother of defendant, who was bidding for his brother-in-law, quit after bidding $9,500, and that Duncan, who was bidding for. another, ceased after bidding $10,500. The bidding thereafter continued. These facts we think show clearly that defendant suffered no injury from her error in requesting two to bid for her. In this connection it may be said that there is some evidence tending .to show that the auctioneer himself ran the property up by making bids. The evidence, however, does not establish this. The witnesses who so testify evidently mistook the auctioneer’s announcement of bids made for his own bidding. It may be also observed here that defendant suggests that she was not mentally in condition to know what she was doing when she signed the auctioneer’s card, due to nervousness and exhaustion following excitement. We think, however, that it appears that she realized at the moment what she was doing, although nervous and somewhat exhausted.
 

 Our conclusion is that plaintiff is liable for the difference between her bid and the amount for which the property was actually sold. The evidence also shows that plaintiff is entitled to the $58.80, the cost of advertising the property, and to the $180 rent sued for, totaling $3,288.80. ' It does not appear that the payment of the item of $10 for the' plans of the property was one of the conditions of either the first or second sale, the conditions in both of .which were the same. We therefore think that it should be rejected, and that the judgment of the lower court should be amended to that extent.
 

 For the reasons assigned, the judgment appealed from is amended by reducing it from $3,298.80 to $3,288.80, and, as thus amended, it is, in all respects, affirmed; defendant to-pay the costs of this appeal.